Brau Ramírez, Juez Ponente
*677 TEXTO COMPLETO DE LA SENTENCIA
I
El Estado Libre Asociado de Puerto Rico recurre, a través del Procurador General, de dos resoluciones emitidas el 5 y 14 de agosto de 1998 por el Tribunal de Primera Instancia, Sala Superior de Ponce, en el procedimiento de epígrafe sobre interdicto provisional presentado ante dicho foro por el E.L.A. contra la corporación H.P.Y., Inc. (“H.P.Y. ”), la Sucesión Mario L. Mercado Riera y otras partes. El procedimiento está relacionado a varias propiedades pertenecientes a los recurridos, situadas en el sector Punta Diamante de Ponce.
Las propiedades en cuestión fueron invadidas por terceros quienes las han venido ocupando desde entonces. El E.L.A., quien ha expropiado parte de las tierras, ahora interesa la expropiación del remanente, con el propósito de evitar el lanzamiento de los ocupantes y conferirles título sobre las parcelas que ocupan.
Mediante la Resolución del 5 de agosto de 1998, el Tribunal aprobó un informe de valoración presentado por el Comisionado Especial designado en el caso relacionado a varias parcelas de terreno pertenecientes a H. P.Y., con una cabida agregada de 90.003 cuerdas.
Mediante su Resolución del 14 de agosto de 1998, el Tribunal determinó que, al expropiar los predios, el E. L.A. venía obligado a pagar a los dueños por el valor de las edificaciones y mejoras introducidas por los invasores y por ciertas agencias del Estado en los predios objeto de la controversia de epígrafe, por haber sido las construcciones llevadas a cabo de mala fe.
Insatisfecho con ambas determinaciones, el E.L.A. ha recurrido ante nosotros. Mediante Resolución emitida el 22 de octubre de 1998, concedimos término a los recurridos para que comparecieran a mostrar causa por la cual no debíamos expedir el auto solicitado y revocar la segunda de las resoluciones recurridas (la del 14 de agosto de 1998). Los recurridos han comparecido por escrito.
Procedemos según lo intimado. Revocamos la Resolución del 14 de agosto de 1998 relacionada con la accesión y compensación de las mejoras y estructuras en controversia. En cuanto a la resolución del 5 de agosto de 1998, concerniente al informe del Comisionado Especial, si bien sostenemos la misma en sus méritos, entendemos que el informe del Comisionado posiblemente debe ser modificado a la luz de nuestro análisis de la controversia sobre las mejoras y estmcturas, por lo que devolvemos el asunto al Tribunal de Primera Instancia para la acción pertinente.
II
HECHOS
1. Las Propiedades de los Recurridos.
Según surge del expediente, la recurrida H.P.Y. es una corporación organizada bajo las leyes de Delaware autorizada a realizar negocios en Puerto Rico.
Para la fecha relevante al presente litigio, H.P.Y. era dueña de una finca de 90.003 cuerdas situada en el Sector Punta Diamante del Barrio Canas de Ponce, compuesta por cinco parcelas. La descripción de las propiedades es la siguiente:
“(A) — RUSTICA: Parcela de terreno que radica en el Barrio Canas del término municipal de Ponce, *678 Puerto Rico, con un área superficial de veintiséis punto seis mil setecientos veinte cuerdas, equivalentes a ciento cuatro mil ochocientos cuarenta punto tres mil ochocientos ochenta y tres metros cuadrados (104,840.3883). Colinda por el Norte con parte de la finca principal en dos direcciones de la cual se segregó las noventa cuerdas de las que la presente es un resto, propiedad de la Sindicatura de la Sociedad Mario Mercado e Hijos, en una distancia la primera dirección de novecientos cincuenta y seis punto quince metros, y la segunda dirección en una distancia de doscientos setenta y tres punto cuatrocientos noventa y seis metros; por el Sur y en una sola dirección y distancia de mil ciento ochenta y ocho punto seiscientos setenta metros con la parcela descrita con la letra “E” en el plano levantado por el Ingeniero Rafael Dosal Lines; por el Este, en una sola dirección y distancia de tres punto quinientos setenta y cuatro metros, con la urbanización Punto Oro; y por el Oeste, en una sola dirección y distancia de ciento dos punto ochenta y cinco metros con terrenos de finca principal conocida por Hacienda Matilde, propiedad de la Sindicatura de la Sociedad Mario Mercado e Hijos y de la cual se segregó la parcela de cincuenta cuerdas de la cual éste es resto. Esta parcela está marcada “A ” en el plano de segregación levantado por el Ingeniero Rafael Dosal Lines.
(B) — RUSTICA: Parcela de terreno que radica en el Barrio Canas del término municipal de Ponce, Puerto Rico, con una cabida de once punto seis mil seiscientos sesenta y seis cuerdas iguales a cuarenta y cinco mil ochocientos cincuenta y cuatro punto cuatro mil cuarenta y seis metros cuadrados (45,854.4046), en lindes por el Norte, con una parcela identificada con la letra (A) en el plano de segregación levantado por el Ingeniero Rafael Dosal Lines, o sea, con más terrenos de la parcela de noventa cuerdas, de cuyo resto, se segrega esta parcela, siendo dicha colindancia una sola alineación de mil ciento cincuenta y cinco punto trescientos cincuenta (1,155.350) metros; por el Sur, en una sola alineación de mil ciento treinta y nueve punto trescientos ochenta y siete metros, colinda con terrenos segregados de la parcela de noventa cuerdas identificada como Parcela “B ” en el plano levantado por el Ingeniero Rafael Dosal Lines antes referido; por el Este, en una sola alineación de cuarenta punto quince metros colinda con la Urbanización Punto Oro; y por el Oeste, en una sola alineación de cuarenta y uno punto quinientos cuatro metros, colinda con más terrenos de la finca principal conocida por Hacienda Matilde, propiedad de la Sociedad Mario Mercado e Hijos.
(C) — RUSTICA: Predio de terreno que radica en el Barrio Canas del término municipal de Ponce, Puerto Rico, con una cabida superficial de ciento once mil trescientos cuarenta y siete metros cuadrados con cincuenta y cinco centímetros de otro (111,347.55) equivalentes a veinte y ocho cuerdas con tres mil trescientos treinta y tres milésimas de otra (28,3333) colindando por el Norte, con las restantes sesenta y uno punto seis mil seiscientos sesenta y siete cuerdas de las noventa cuerdas originales, en una distancia de mil ciento treinta y nueve punto quinientos ochenta y siete metros (1,139.587) y un rumbo de setenta y ocho grados cuarenta y seis minutos y cincuenta y cuatro segundos Norte al Este. Por el Sur, con terrenos de la Urbanización Punto Oro en una distancia de mil noventa y cinco punto seiscientos y diez y ocho metros (1,095.618) y un rumbo de setenta y ocho grados cincuenta y siete minutos con cincuenta y tres segundos Sur al Oeste. Por el Este, con terrenos de la Urbanización Punto Oro, en una distancia de sesenta y cinco punto novecientos treinta y ocho metros (65.938) con un rumbo de cuatro grados, dos minutos y tres segundos Sur al Este, y una distancia de treinta y siete punto cero setenta y dos metros (37.072), con un rumbo de tres grados, cuarenta y un minutos y cuarenta y siete segundos Sur a Oeste. Por el Oeste, con terrenos de la finca principal conocida por Hacienda Matilde, propiedad de la Sociedad Mario Mercado e Hijos de donde se segregó la parcela de noventa cuerdas de la cual la parcela que aquí se describe es segregación en una distancia de ciento uno punto ciento ochenta y cinco metros (101.185) con un rumbo de veinte y seis grados, tres minutos y siete segundos Norte al Oeste.
(D) — RUSTICA: Parcela de terreno que radica en el Barrio Canas del término municipal de Ponce, Puerto Rico, con un área superficial de cuarenta y cinco mil ochocientos cuarenta y nueve punto tres mil *679 quinientos treinta y nueve metros cuadrados (45,849.3539) m/c, equivalentes a once punto seiscientos sesenta y seis (11,666) cuerdas. Colinda por el Norte, en una sola dirección y una distancia de mil ciento setenta punto novecientos diecisiete metros con la parcela marcada “A” en el plano de segregación levantado por el Ingeniero Rafael Dosal Lines; por el Sur, en una sola dirección y distancia de mil ciento cincuenta y cinco punto trescientos cincuenta metros con la parcela marcada “C” en el antes referido plano que fuera segregada de la finca de noventa cuerdas de cuyo resto se segrega esta parcela; por el Este, en una sola dirección con terrenos de la Urbanización Punto Oro en una distancia de treinta y nueve punto cuatrocientos ochenta y cuatro metros; y por el Oeste, en una sola dirección y una distancia de cuarenta y uno punto cero sesenta y cinco metros, con terrenos de la Hacienda Matilde, propiedad de la Sociedad Mario Mercado e Hijos de la cual se segregaron las noventa cuerdas de cuyo resto se segrega esta parcela.
(E) — RUSTICA: Parcela de terreno radicada en el Barrio Canas del término municipal de Ponce, Puerto Rico, con una cabida superficial de once punto seiscientos sesenta y seis (11.666) cuerdas, equivalentes a cuarenta y cinco mil ochocientos cuarenta y nueve punto tres mil quinientos treinta y nueve metros. Colinda por el Norte, en una sola dirección y distancia de mil ciento ochenta y ocho punto seiscientos setenta metros, con la parcela marcada ‘A ” del plano de segregación levantado por el Ingeniero Rafael Dosal Lines; por el Sur, en una sola dirección y distancia de mil ciento setenta punto novecientos diecisiete metros con la parcela marcada “D ” en el plano de segregación referido y que fuera segregada de la finca de noventa cuerdas de cuyo resto se segrega la parcela aquí descrita; por el Este, en una sola dirección con terrenos de la Urbanización Punto Oro en una distancia de treinta y ocho punto novecientos noventa y tres metros; y por el Oeste, en una sola dirección y distancia de cuarenta punto doscientos cuarenta y tres metros con terrenos de la Hacienda Matilde propiedad de la Sindicatura de la Sociedad de Mario Mercado e Hijos de la cual se segregaron las noventa cuerdas de cuyo resto se segrega esta parcela. ”
Por su parte, la Sucesión de Mario L. Mercado Riera era dueña en pleno dominio de una propiedad, conocida como la Finca Matilde, localizada en el Barrio Canas de Ponce, aledaña a la finca de H.P.Y., compuesta por tres parcelas.
La descripción de estas propiedades es la siguiente:

Parcela MT-CUATRO, RUSTICA: Radicada en el Barrio Canas del término municipal de Ponce, con una cabida de SETECIENTAS CINCUENTA Y CINCO CUERDAS CINCUENTA Y OCHO CENTIMOS, equivalentes a doscientas cincuenta y siete hectáreas, sesenta y seis áreas, noventa y una centiáreas y seiscientas treinta y dos miliáreas, compuesta de las siguientes porciones:

—Porción A: Rústica: Radicada en el Barrio Canas del término municipal de Ponce, con una cabida de doscientas cuarenta y seis cuerdas setenta y tres céntimos, equivalentes a noventa y seis hectáreas, noventa y siete áreas, cuarenta y siete centiáreas y quinientas noventa y dos miliáreas, colindando por el Norte, con la carretera estatal número dos, en diez alineaciones que totalizan cincuenta y ocho punto noventa y nueve metros; por el Este, con terrenos de la Autoridad de Acueductos y Alcantarillados de Puerto Rico: Oficina Regional en cuatro alineaciones que totalizan ciento setenta y dos punto setenta y un metros con la porción MT-Tres-Llano en una alineación de setecientos veinte punto cuarenta y un metros; por el Sur, con el Mar Caribe en treinta y cinco alineaciones que totalizan dos mil cuarenta y siete punto setenta y tres metros y por el Oeste, con la Laguna de Las Salinas en siete alineaciones que totalizan mil ciento noventa y ocho punto sesenta y siete metros. Esta porción está identificada en el plano de segregación como parcelas MT-Cuatro-Llana-A- de ciento ochenta y cinco cuerdas noventa y ocho céntimos y MT-Cuatro-Llana-B-, sesenta cuerdas setenta y cinco céntimos.
*680 — Porción B: Rústica: Radicada en el Barrio Canas del término municipal de Ponce, con cabida de treinta y siete cuerdas setenta y tres céntimos, equivalentes a catorce hectáreas, ochenta y dos áreas, noventa y tres centiáreas y novecientas noventa y dos miliáreas, colindando por el Norte, con la porción MT-Tres - Industrial de la Parcela MT-Tres en una alineación de doscientos setenta y uno punto veinticuatro metros; por el Este, con terrenos de Programas Sociales de Puerto Rico en diez y ocho alineaciones que totalizan quinientos cincuenta y siete punto noventa y siete metros; por el Sur, con la Carretera Estatal número dos, en dos alineaciones que totalizan doscientos sesenta y seis punto setenta y seis metros y por el Oeste, con la porción MT-Tres Escarpado de la parcela MT-Tres en una alineación de cuatrocientos ochenta punto doce metros. Esta porción está identificada en el plano de segregación como parcela MT-Cuatro Industrial.
— Porción C: Rústica: Radicada en el Barrio Canas del término municipal de Ponce, con cabida de trescientas setenta y una cuerdas doce céntimos, equivalentes a ciento cuarenta y cinco hectáreas, ochenta y seis áreas, cincuenta centiáreas y cero cuarenta y ocho miliáreas, colindando por el Norte, con terrenos de las Empresas Ferré en diez alineaciones que totalizan novecientos cincuenta y ocho punto diez metros; con terrenos de Nicolás Pagán en cinco alineaciones que totalizan doscientos noventa y siete punto veintisiete metros; con terrenos de las Empresas Ferré en veintisiete alineaciones que totalizan setecientos punto cincuenta y nueve metros y con terrenos del Doctor Humberto Zayas Chardón en cinco alineaciones que totalizan doscientos ochenta y tres punto cuarenta y un metros; por el Este, con terrenos de la Urbanización Punto Oro en cuatro alineaciones que totalizan mil cuatrocientos cuarenta y siete punto nueve metros; por el Sur, con terrenos de la Ponce West Industrial Area y terrenos de Programas Sociales en trece alineaciones que totalizan cuatrocientos ochenta y nueve punto diez metros y con terrenos de la Administración de Terrenos de Puerto Rico en catorce alineaciones que totalizan dos mil veintitrés punto treinta y cuatro metros; y por el Oeste, con la Porción MT-Tres-Escarpado de la Parcela MT-Tres, en una alineación de mil doscientos cinco punto setenta y cinco metros. Esta porción está identificada en el plano de segregación como MT-Cuatro-Escarpada. ”
Similarmente, el Sr. Alfonso Hernández Ortiz era dueño de una parcela de 30.16 cuerdas situada en el Barrio Canas de Ponce. La propiedad tenía la siguiente descripción:

RUSTICA: Parcela de terreno radicada en el Barrio Canas del término municipal de Ponce, Puerto Rico, con una cabida superficial original de ciento cincuenta y tres mil novecientos veintitrés punto seis mil doscientos treinta y seis (153,923.6236) metros cuadrados, equivalentes a treinta y nueve punto mil seiscientos veintiuna (39.1621) cuerdas, que luego de segregarse treinta y cinco mil trescientos setenta y seis punto mil setecientos (35,376.1700) metros cuadrados, equivalentes a nueve punto cero cero cero siete (9.0007) cuerdas que formó la finca número veintisiete mil ciento ochenta y ocho (27,188), queda con un remanente de ciento dieciocho mil quinientos cuarenta y seis punto cuatro mil quinientos treinta y seis (118,546.4536), equivalentes a treinta punto mil seiscientos catorce (30.1614) cuerdas, en lindes por el Norte, con la calle número uno (1) a construirse de la Urbanización Punto Oro y en una distancia de ciento cincuenta y cuatro mil doscientos cuarenta y ocho (154,248) metros lineales; por el Sur, y en diferentes alineaciones en una distancia de quinientos cincuenta punto seiscientos treinta y siete (550.637) metros lineales con la carretera estatal número dos (2) (“Ponce By Pass”); por el Este, en una distancia de ochocientos sesenta y nueve punto doscientos cincuenta y siete (869.257) metros lineales con la calle número uno (1) de la Urbanización Punto Oro y por el Oeste, en varias alineaciones y con una distancia de seiscientos cuarenta y cuatro punto trescientos cuarenta y uno (644.341) metros lineales con la Urbanización Industrial El Tuque. ”

2. La Invasión de las Tierras y los Casos de Desahucio.
En o alrededor del año 1985, las fincas mencionadas fueron invadidas y ocupadas ilegalmente por personas *681 de escasos recursos económicos. Los invasores procedieron a dividir las tierras ocupadas en solares y a edificar casas y otras estructuras.
Para evitar que la invasión se propagara, el 15 de julio de 1985, el E.L.A. instó la presente petición de entredicho provisional e interdicto preliminar y permanente contra varios de los invasores y contra H.P.Y. y la Sucesión Mercado Riera, solicitando al Tribunal que se paralizaran las obras de construcción en los terrenos. Entre otras alegaciones, el E.L.A. planteó que tales edificaciones se habían realizado ilegalmente con la anuencia o tolerancia de sus dueños (H.P.Y. y la Sucesión Mercado Riera), Caso Núm. CS-85-1459.
A la fecha de la presentación del caso, en los terrenos invadidos ya se habían lotificado aproximadamente setecientos cuarenta y siete (747) solares y levantado más o menos ciento cincuenta (150) estructuras.
H.P.Y. y la Sucesión Mercado Riera presentaron demandas contra co-parte contra los invasores, alegando que éstos habían entrado en sus tierras ilegalmente y solicitando del Tribunal que se les lanzara de la propiedad y que se les ordenara remover las estmcturas que habían construido. Se solicitó, además, que la demanda fuese tramitada como un pleito de clase, solicitud que fue concedida por el Tribunal mediante resolución del 20 de septiembre de 1985.
El 31 de octubre de 1986, el E.L.A. solicitó desistir de su petición original. En su moción, el E.L.A. alegó que la lotificación de los solares así como la construcción de estructuras en las tierras invadidas se habían multiplicado desde la presentación de la demanda, por lo que “el problema ha dejado de ser uno exclusivamente legal para convertirse en uno socioeconómico, requiriendo una gestión, por parte de varias agencias del Estado Libre Asociado mucho más abarcadora y compleja que la que se pretendió llevar con la radicación de este pleito.” La moción añadía que:

“[A jnte el problema crítico de vivienda existente en el área de Ponce, y en especial los problemas que ha confrontado dicha comunidad en los últimos meses, ha llevado al Estado, a través de sus agencias, a reevaluar su posición con el propósito de solucionar administrativamente no solamente el problema de la lotificación de solares y de la construcción clandestina, a lo que iba' dirigida esta acción judicial, sino también la relocalización ordenada de la cantidad de familias que se han establecido en el Sector Punta Diamante. ”

Según se desprende del expediente, la moción del E.L.A. respondió a que para esta fecha las autoridades gubernamentales habían decidido llevar a cabo la expropiación de parte de los terrenos invadidos con el fin de repartir los mismos a los invasores y a otras personas necesitadas de vivienda. No obstante, H.P.Y. se opuso a la solicitud.
El 26 de noviembre de 1986, mientras la solicitud de desistimiento del E.L.A. se hallaba pendiente, el Sr. Hernández Ortiz instó una demanda de desahucio y accesión contra varios de los invasores que habían tomado posesión de sus tierras, solicitando el desalojo de los mismos, Caso Núm. CS86-2817. La demanda fue posteriormente consolidada con el caso Núm. CS-85-1459 presentado por el E.L.A.
Oportunamente, y ante la oposición de H.P.Y. a la solicitud de desistimiento del E.L.A., el Tribunal ordenó a las agencias encargadas que confirmaran su intención en cuanto a los predios en controversia y que informaran el estado de sus gestiones. El Gobierno no cumplió con esta orden. En vista de lo anterior, el Tribunal denegó la solicitud de desistimiento mediante Resolución del 20 de marzo de 1987.
3. La Expropiación de los Terrenos.
*682 El 23 de abril de 1987, la Sucesión Mercado presentó una reconvención contra el E.L.A. en el caso CS-85-1459, alegando que la invasión de la propiedad había sido tolerada por las autoridades, las cuales, actuando dolosa o negligentemente, se habían negado a proceder contra los invasores. La Sucesión planteó que, como cuestión de hecho, la ocupación de los terrenos se había intensificado debido a las representaciones del Departamento de Vivienda, el cual había inducido a los invasores a creer que el Estado habría de adquirir las propiedades. La Sucesión Mercado Riera alegó que las actuaciones del E.L.A. la habían efectivamente privado de su propiedad, por lo que solicitó que se ordenara la expropiación de su predio de terreno. También solicitó que se le resarciera por los daños ocasionados por la conducta del E.L.A.
El 4 de junio de 1987, el Tribunal emitió una Resolución en el caso CS86-2817 disponiendo que cualquier agregación o construcción adicional hecha con posterioridad a dicha fecha en los terrenos objeto de la presente controversia se entendería que fue realizada de mala fe.
Así las cosas, el 10 de octubre de 1988, el E.L.A. presentó una demanda para la expropiación de un predio de 199.0843 cuerdas en el Barrio Canas del Municipio de Ponce; Caso Núm. 88-0418. La descripción del inmueble a ser expropiado era la siguiente:

“RUSTICA: Parcela de terreno radicada en el Barrio Canas del término municipal de Ponce, con un área superficial de 199.0843 cuerdas, equivalentes a 782,480.8770 metros cuadrados, según mensura realizada por la Administración de Vivienda Rural, en lindes: por el Norte, con Empresas Ferré y el Dr. Humberto Tuyas Chardón; por el Sur con la quebrada Las Batatas; por el Este, con la Urb. Ext. Punto Oro y por el oeste, con la finca principal. ”

Según surge del expediente, el propósito de la expropiación era conceder título de propiedad a centenares de ocupantes ilegales mediante el desarrollo de un proyecto para vivienda en el área Punta Diamante a ser realizado por la Administración de Vivienda Rural del Departamento de la Vivienda. Junto con su petición, el Estado consignó la suma de $194,400.00 como compensación por la propiedad.
El 3 de noviembre de 1988, la Sala de Expropiaciones emitió una Resolución admitiendo la petición y confiriendo a la Administración de Vivienda Rural el título sobre la propiedad en cuestión.
Según refleja el récord, a partir de este momento, varias agencias e instrumentalidades del Gobierno desarrollaron obras de infraestructura en los terrenos invadidos, incluyendo en tierras pertenecientes a H.P.Y., entendiendo que los mismos habían sido expropiados. La Administración de Vivienda Rural, la Autoridad de Acueductos y Alcantarillados, la Autoridad de Energía Eléctrica y el Municipio de Ponce construyeron e instalaron distintas facilidades dirigidas a suplir las necesidades de los ocupantes de los predios. Se construyeron calles, alcantarillados y facilidades para el servicio de electricidad.
4. La Confusión en los Linderos.
La petición de expropiación sometida por el E.L.A. había expresado que el dueño y única parte interesada en la expropiación lo era la Sucesión Mercado Riera. El Estado alegaba que los terrenos de H.P.Y. no estaban incluidos en la expropiación. No obstante, del plano de mensura incluido con la petición, realizado por el agrimensor Ismael Cordero, se desprendía que la propiedad que fue expropiada colindaba por el Este con la Urbanización Punto Oro, lo que implicaba que sí se había incluido una porción substancial de los terrenos de H.P.Y.
De primera impresión, H.P.Y. parece haber aceptado la contención del E.L.A. de que no se le habían *683 expropiado tierras de su propiedad. Conforme a una solicitud de desistimiento con perjuicio presentada por H.P. Y. en el caso CS-85-1459, el 1ro de mayo de 1990, la Sala de Ponce archivó las reclamaciones instadas por dicha parte. Seis días más tarde, el 7 de mayo de 1990, el Tribunal emitió una Sentencia Parcial desestimando, en sus méritos, la reclamación por daños instada por la Sucesión Mercado Riera contra el E.L.A.
En su Sentencia, el Tribunal de Primera Instancia concluyó que el Estado no podía ser hallado responsable por su omisión de actuar contra los invasores ni por su decisión de desistir de su demanda de injunction presentada en el caso CS-85-1459 porque todas las partes habían actuado bajo la creencia de que el predio ocupado por los invasores había estado incluido en el terreno expropiado en el caso KEF-88-0418.
El que el Estado no haya insistido en su reclamo original, no quiere decir que el primero haya sido negligente en presentar o en tramitar su demanda. Lo sorprendente de la alegación de la Sucesión es que ésta admite que la decisión de desistir se da cuando todos, incluso la propia Sucesión, creen que ese predio se encuentra dentro de lo que ya ha sido expropiado.
El caso continuó en cuanto a las solicitudes de desahucio presentadas por los titulares de los predios contra los invasores. No está claro si el E.L.A. tuvo una participación directa en esta etapa, aunque aparentemente continuó siendo notificado de los procedimientos.
El 14 de septiembre de 1990, H.P.Y. solicitó la reapertura de su reclamación, luego de que la Sucesión Mercado le hiciera entrega de una nueva mensura que reflejaba la existencia de una controversia relacionada a los puntos de su colindancia con el predio expropiado por el Estado. La mensura reflejaba que, contrario a lo expresado por el E.L.A. a H.P.Y., sí se le había expropiado terreno.
H.P.Y. también solicitó intervenir en el pleito de expropiación. Esta solicitud fue denegada el 30 de octubre de 1990, toda vez que el E.L.A. insistía en que no le había expropiado tierras. El E.L.A. se opuso a la intervención negando las alegaciones de H.P.Y. Posteriormente, el Tribunal denegó la intervención.
Las manifestaciones del E.L.A. de que no se habían expropiado terrenos de H.P.Y. resultaban contrarias al plano de expropiación, por lo que la Sala de Expropiaciones ordenó que se corrigiera el mismo, de conformidad con la posición asumida por el Estado. Dicha corrección nunca se efectuó. Tampoco los casos llegaron a consolidarse, por lo que los pleitos de desahucio continuaron tramitándose de forma separada del pleito de expropiación.
5. La Sentencia de Desahucio y los Procedimientos Para su Ejecución.
El 4 de junio de 1991, el Tribunal dictó Sentencia en los casos consolidados CS-85-1459 y CS86-2817, declarando con lugar las solicitudes de desahucio instadas por H.P.Y., la Sucesión Mercado y el Sr. Hernández Ortiz.
En su sentencia, el Tribunal concluyó que los predios habían sido objeto de una invasión ilegal y que los poseedores no contaban con título alguno sobre las tierras. Determinó que los ocupantes eran constmctores de mala fe, por lo que no tenían derecho alguno a continuar en posesión de sus viviendas. El Tribunal dispuso el desalojo de los invasores de los predios.
La sentencia no mencionaba el pleito de expropiación ni intentaba distinguir entre los invasores que estaban en terrenos adquiridos por el E.L.A. y aquellos que permanecían en las propiedades de H.P.Y. y la Sucesión Mercado Riera y el Sr. Hernández.
*684 La sentencia fue notificada a todas las partes, incluyendo al E.L.A. El 28 de junio de 1991, el Estado presentó una solicitud de enmienda nunc pro tunc a la sentencia dictada, solicitando que se aclarara que la sentencia no tenía efecto alguno respecto las personas que ocupaban el predio expropiado en el caso KEF-88-0418.
El 10 de abril de 1992, el Tribunal expidió un mandamiento en ejecución de sentencia del cual se excluyó el predio expropiado del alcance del dictamen a ejecutarse. No obstante, debido a la confusión existente en tomo a las conlindancias de la finca expropiada, el Alguacil General se vio precisado a solicitarle al Tribunal que se nombrara un agrimensor para que se trazaran los límites del área a ser desalojada. El E.L.A., por su parte, compareció ante el Tribunal para evitar el lanzamiento de los ocupantes, alegando que éstos estaban en los terrenos expropiados por el Estado.
El Tribunal de Primera Instancia procedió a designar al agrimensor Julio C. Ríos para que llevara a cabo una nueva mensura de los predios y aclarara la situación.
El 28 de julio de 1992, el agrimensor Ríos rindió un informe al Tribunal en el cual concluia que en el plano de expropiación preparado por el E.L.A. se habían incluido equivocadamente terrenos pertenecientes a la recurrida H.P.Y.
A raíz del mencionado informe pericial, el E.L.A. presentó una moción de intervención en la causa de epígrafe a fin de impedir el desalojo de los ocupantes hasta que se dilucidara la controversia de los linderos de las fincas en cuestión.
El 16 de octubre de 1992, el Tribunal ordenó la paralización de la ejecución de su sentencia hasta tanto la Sala de Expropiaciones adjudicara finalmente el pleito sobre expropiación forzosa. El Tribunal de Primera Instancia entendió que la Sala de Expropiaciones estaba en una mejor posición para determinar las colindancias de los predios en controversia.
El 8 de diciembre de 1995, la Sala de Expropiaciones dictó finalmente Sentencia en el caso KEF-88-0418, ordenando al E.L.A. a pagarle a la Sucesión Mercado Riera una suma adicional de $663,791.08, además de los $194,400.00 consignados, como compensación por la expropiación. En su dictamen, el cual estuvo basado en las estipulaciones de las partes, el Tribunal se reafirmó en su determinación anterior de que no se habían expropiado terrenos de H.P.Y. Dicha determinación, según señalado, era contraria al plano de la propiedad expropiada y a la realidad de la ocupación. A H.P.Y., sin embargo, no se le había permitido intervenir en los procedimientos, por lo que no pudo apercibir al Tribunal sobre esta situación.
Así las cosas, H.P.Y. insistió entonces en que se pusiera en vigor la Sentencia emitida en los casos CS-85-1459 y CS86-2817 y que se ordenara el desalojo de los invasores de la porción ocupada de su propiedad, la cual el E.L.A. insistía no haber expropiado. El E.L.A., contrario a lo que había alegado ante el Tribunal de Expropiaciones, levantó ahora que los terrenos invadidos de H.P.Y. estaban comprendidos dentro del plano de expropiación preparado por el agrimensor Cordero. En este momento, a su vez, la Sucesión Mercado Riera alegó que existían diecisiete (17) cuerdas de terreno de su propiedad que no habían sido expropiadas en el caso KEF-88-0418, a pesar de también estar invadidas, por lo que solicitó que se lanzara a los ocupantes, a tenor con la Sentencia del 4 de septiembre de 1991.
No obstante los requerimientos de H.P.Y. y de la Sucesión Mercado Riera de que se pusiera en vigor la sentencia de desahucio contra los invasores que estaban ocupando terrenos que no habían sido incluidos en la expropiación, el Tribunal de Primera Instancia se rehusó a poner en vigor dicho dictamen. En su lugar, durante *685 los meses posteriores a febrero de 1996, la ilustrada Sala de Instancia celebró numerosos señalamientos para discutir la situación, a los que fueron citadas las agencias gubernamentales correspondientes a quienes se les exigió un estudio del impacto del lanzamiento proyectado. 
De la discusión sostenida durante este período varias cosas emergieron con claridad: (1) que H.P.Y. no había recibido compensación alguna por terrenos de su propiedad que habían sido invadidos e incluidos en el plano de expropiación, debido a ciertos errores sobre los linderos de los predios según trazados por el agrimensor del E.L. A., (2) que la expropiación también había omitido un sector de las tierras de la Sucesión Mercado que habían sido invadidas y desarrolladas por la Administración de Desarrollo y Mejoras de Vivienda Urbana, quien había sustituido a la Administración de Vivienda Rural, y (3) que los ocupantes de los terrenos invadidos no incluidos en la expropiación quedaban sujetos a la sentencia de desahucio emitida por el Tribunal en los casos consolidados CS-85-1459 y CS86-2817 el 4 de junio de 1991.
6. La Expropiación de los Otros Terrenos Invadidos.
Como resultado de las gestiones del Tribunal, el 14 de mayo de 1996, la Administración de Desarrollo y Mejoras de Vivienda Urbana se comprometió a compensar a los propietarios de los terrenos invadidos que no hubieran recibido dicha compensación en el caso KEF-88-418, ampliando la expropiación para incluir todos los terrenos del sector Punta Diamante.
A tal efecto, el 14 de junio de 1996, la Asamblea Legislativa aprobó la Resolución Conjunta Número 245 asignando a la Administración la cantidad de $2,941,000.00 para adquirir y realizar mejoras físicas en los terrenos que ubicaran más allá de las 199.0843 cuerdas ya expropiadas por el E.L.A.
La determinación del Gobierno tomó académico el cumplimiento de la sentencia de desahucio emitida por el Tribunal el 4 de junio de 1991. Quedó pendiente, sin embargo, la identificación de las tierras envueltas, así como la fijación de la compensación para los propietarios.
El 27 de junio de 1997, el E.L.A. consignó la suma de $2,000,000.00 a dividirse en partes iguales entre la Sucesión Mercado y HPY para compensarlos parcialmente por los terrenos que el Estado se comprometió adquirir. Se trataba, según se desprende del récord, de la parcela de 90.003 cuerdas perteneciente a H.P.Y. y otra de 17.401 cuerdas perteneciente a la Sucesión Mercado.
El 4 de octubre de 1996, las partes acordaron solicitar el nombramiento de un Comisionado Especial, a fin de fijar el justo valor de los nuevos terrenos a ser adquiridos por el Estado. Posteriormente, las partes sugirieron se nombrara al Ledo. Domingo Rafucci Ruiz para fungir en esta capacidad.
El 22 de enero de 1997, el Tribunal emitió orden designando al Ledo. Rafucci como Comisionado Especial y le encargó resolver las siguientes controversias:

“a) Valoración de los terrenos de conformidad con el ordenamiento jurídico vigente a la fecha del 15 de mayo de 1996.

b) Valoración de las estructuras situadas en los terrenos aludidos en el párrafo anterior; sujeto a la determinación final del Tribunal sobre la procedencia de la compensación de los mismos y de proceder, hasta qué fecha límite estaría el Gobierno obligado a compensar por dichas estructuras construidas por los ocupantes y poseedores de mala fe.

*686
c) Valoración de la infraestructura existente de conformidad con el párrafo anterior.

En esta etapa, se suscitó controversia sobre el alcance de la compensación que el Estado venía obligado a proveer a los dueños de las propiedades. H.P.Y. y la Sucesión Mercado reclamaban que el E.L.A. venía obligado a pagarles por las estructuras y mejoras constmidas en sus propiedades, así como por los gastos y honorarios de abogado incurridos por dichas partes en los distintos procedimientos. En sus escritos, H.P.Y. valoró dichas edificaciones en diez millones de dólares ($10,000,000.00), esto es, cinco (5) veces más de los dos millones ($2,000,000.00) consignados por el Estado para pagar por los terrenos.
El E.L.A. se opuso a esta pretensión, alegando que sólo venía obligado a pagar por el valor de los terrenos y no de las estructuras y mejoras. Las partes sometieron memorandos en apoyo a sus respectivas posiciones.
El 10 de julio de 1997, mientras esta controversia estaba pendiente, el Comisionado Especial emitió un voluminoso informe sobre el valor en el mercado de la parcela de 90.003 cuerdas propiedad de H.P.Y., con exclusión de las mejoras y estmcturas. El Comisionado determinó que el valor en el mercado de dicha propiedad ascendía a $3,418,508.80, equivalente aun valor de $9.50 por metro unitario.
Para llegar a su conclusión, el Comisionado comparó la parcela de H.P.Y. con otros predios de terrenos vendidos en el área y que resultaban similares al de H.P.Y. en cabida, tiempo, topografía y suelos, ubicación, acceso, vistas y mejor uso. En particular, utilizó las ventas comparables de cinco otras propiedades situadas en el área que, a su juicio, eran pertinentes para llegar al valor en el mercado de los predios en cuestión.
El E.L.A. presentó ciertas objeciones al informe, las que fueron contestadas por H.P.Y. e incorporadas en un informe complementario sometido por el Comisionado el 14 de octubre de 1997.
7. Las Resoluciones Recurridas.
Luego de otros incidentes, el 5 de agosto de 1998, el Tribunal emitió la primera de las resoluciones recurridas en este recurso, aprobando el informe de valoración del Comisionado Especial.
En su Resolución, el Tribunal observó que el Comisionado, quien era una persona de vasta experiencia en la materia, había realizado un estudio de numerosa prueba documental, así como celebrado vistas evidenciarías en las que había tenido la oportunidad de escuchar a los testigos, y que no existía base alguna para sustituir sus conclusiones.
Dos días después, el 7 de agosto de 1998, el Tribunal emitió una Resolución aprobando el plano final de las propiedades envueltas en la controversia.
En su Resolución, el Tribunal observó que:

“La omisión del E.L.A. de enmendar el [plano de expropiación] para conformarlo] con la realidad de los terrenos y ala intención y propósito que surge de los autos de[l]... caso KEF-88-0418, causó que se prolongara la nube de confusión sobre la ubicación y linderos de los terrenos ilegalmente ocupados, pertenecientes a H.P.Y. y ala Sucesión Mercado, cuya ejecución de sentencia se había solicitado en el caso de epígrafe.

El plano que hemos adoptado aclara finalmente la confusión... ”.

El Tribunal también determinó que la descripción de la finca expropiada por el E.L.A. era la siguiente:
*687 “RUSTICA: Parcela de terreno radicada en el Barrio Canas del término municipal de Ponce, con un área superficial de ciento noventa y nueve (199) cuerdas con ochocientas cuarenta y tres (843) diezmilésimas de cuerdas (199.0843) según el plano confeccionado por el agrimensor Hernán Lugo Rodríguez, fechado el pasado mes de septiembre de 1996, y refrendado por el profesor Julio César Ríos, o sea, el “FINCA A” en lindes por el NORTE, con terrenos de (i) Don Nicolás Pagán, (ii) Empresas Ferré, Inc. y (iii) Dr. Humberto Tuyas Churdón (hoy Municipio Autónomo de Ponce); SUR, con la Quebrada Las Batatas y terrenos del Estado Libre Asociado de Puerto Rico de la COMUNIDAD RURAL CANAS y COMUNIDAD RURAL LAS BATATAS; -. —.ESTE, con terrenos de: (i) HPY, Inc., y (ii) Sucesión Mario Mercado Riera, en un remanente de la finca principal de donde que se segrega y designado y denominado por el agrimensor Hernán Lugo Rodríguez, en su plano fechado el pasado mes de septiembre de mil novecientos noventa y seis (1996), como “LOTE-XY”. .OESTE, terrenos de: (i) Sucesión Mario Mercado Riera, en un remanente de la finca principal de donde que se segrega, y designado y denominado por el agrimensor Hernán Lugo Rodríguez, en su plano fechado el pasado mes de septiembre de mil novecientos noventa y seis (1996), como “REMANENTE 1”, (ii) Estado Libre Asociado de Puerto Rico de la COMUNIDAD RURAL CANAS y COMUNIDAD RURAL LAS BATATAS; (iii) Administración de Terrenos de Puerto Rico. ”
Por otro lado, el Tribunal determinó que la propiedad perteneciente a la Sucesión Mercado Riera afectada por la ocupación ilegal de personas y que aún estaba pendiente de expropiación era la siguiente:

“RUSTICA: Parcela de terreno que radica en el Barrio Canas del término municipal de Ponce, Puerto Rico, con una cabida superficial de sesenta y ocho mil trescientos noventa y cuatro punto ciento ochenta y siete (68,394.187) metros cuadrados, equivalentes a diez y siete punto cuatrocientas (17.400) cuerdas, en lindes por el: NORTE con terrenos de HPY, Inc.; —.SUR, con terrenos del Estado Libre Asociado de Puerto Rico en la “COMUNIDAD RURAL CANAS” ;.ESTE, con terrenos de Alfonso A. Hernández Ortiz; y OESTE, con terrenos del Estado Libre Asociado de Puerto Rico en la “COMUNIDAD RURAL PUNTO DIAMANTE” expropiados en Caso Número: KEF 88-0418 y designado por el agrimensor Hernán Lugo Rodríguez, en su plano fechado el pasado mes de febrero de 1996, como la propiedad expropiada, o sea, el “LOTE A”.

Pocos días después, el 14 de agosto de 1998, el Tribunal emitió la segunda de las resoluciones recurridas, relacionadas a las mejoras y estructuras construidas en los predios que no se habían expropiado. El Tribunal concluyó que los propietarios de dichos terrenos tenían derecho a hacer suyas las edificaciones y mejoras por accesión, por lo que el Estado venía en la obligación de pagar justa compensación por todo ello, previo a adquirir dichos terrenos.
En su resolución, la ilustrada Sala recurrida observó que la Comunidad Punta Diamante, nacida de la invasión de los terrenos de los recurridos, “está integrada por puertorriqueños, muchos de ellos jóvenes; gente buena, honrada y trabajadora; con intenciones y propósitos bonafide de residir y vivir allí porque necesitan la vivienda y porque quieren ejercer sus legítimos derechos a la vida, a la libertad, al disfrute de la propiedad y a la búsqueda de la felicidad. ”
El Tribunal reconoció que los invasores habían sido vencidos en el pleito sobre desahucio, “pero no se llegó a proceder con el lanzamiento por razón de la confusión e imprecisión de los terrenos expropiados por el Estado Libre Asociado. ” El Tribunal observó que en el pleito de expropiación forzosa se había determinado que el predio expropiado no incluia la propiedad de H.P.Y., ordenándose que se corrigiera el plano, pero que el E.L.A. entonces había intervenido en el caso de desahucio, invocando el plano de expropiación que nunca fue enmendado “asumiendo... una posición antijurídica y de confusión procesal. ”
El Tribunal señaló que la fecha determinante para fijar la compensación lo era el 14 de mayo de 1996, fecha *688 en la que el Gobierno se comprometió a adquirir los predios que no habían sido expropiados:

“El Gobierno de Puerto Rico ese día se obligó ante este Tribunal a adquirir, ya sea por compraventa o por expropiación, todos los terrenos adicionales y los terrenos remanentes de la finca ya expropiada que estuvieren ocupados ilegalmente por la Comunidad Punta Diamante.... ”.

No podemos perder de vista que la situación subyacente era la solicitud para ejecutar la Sentencia mediante el lanzamiento y desalojo de una comunidad, ya establecida, compuesta por cientos de familias ocupando ilegalmente propiedad privada. En esos terrenos ya se habían levantado e incorporado al suelo diversos tipos de construcciones, incluyendo casas de madera, de cemento y bloques, calles, encintados, líneas eléctricas, etc. Las mejoras y estructuras se habían construido de mala fe tanto por los ocupantes o “invasores” como por el propio Estado Libre Asociado en propiedades privadas objeto de la Sentencia dictada por este Tribunal.
Es en este contexto que el Estado conocía, que se obligó a adquirir unos terrenos privados con todas sus consecuencias de accesión, compensación y valoración derivadas de las Sentencia y de la ley.
El Tribunal determinó que el Estado había obrado en todo momento con conocimiento sobre la situación de los predios:

“El Estado ha tenido conocimiento y participación en este caso tanto deforma directa como indirecta, desde el principio. Al intervenir en los procedimientos post-sentencia que se celebraron con miras a evaluar alternativas a la ejecución de la sentencia dictada contra la Comunidad Punta Diamante, el Estado Libre Asociado se tuvo que confrontar con sus propios actos y omisiones. Se tuvo que enfrentar a una sentencia final y firme con efectos de interdicción posesoria. Como consecuencia de todo ello, y para evitar también las serias consecuencias de un entonces potencial lanzamiento y desalojo de gran parte de las mil doscientas (1,200) familias aproximadamente que componen la Comunidad Punta Diamante, el E.L.A. se decidió a adquirir la propiedad privada ocupada por dicha comunidad. Con el compromiso formalizado por el E.L.A. y aceptado por Ips propietarios de los terrenos ocupados, el Tribunal decretó, y en este acto ratifica, que no habrá de proceder al lanzamiento y desalojo que tanta incertidumbre y preocupación estaba causando a los vecinos de Punta Diamante. En lugar de eso, los procedimientos judiciales a seguir han sido para dilucidar y perfeccionar la adquisición y transferencia de los terrenos a favor del E.L.A., así como la determinación de la justa compensación por los mismos... ”.

El Tribunal determinó que el E.L.A. no podía alegar la existencia de un error de buena fe en cuanto al título sobre lo expropiado, porque:

“la mera alegación de una creencia no basta. Sus actos contradictorios en relación a lo que incluye y lo que excluye la expropiación; las informaciones que recibía para alertar el Estado Libre Asociado de sus errores y contradicciones tanto en el caso de expropiación forzosa como en el caso del epígrafe; su conducta temeraria o intransigente en ciertas etapas históricas de los procedimientos judiciales; todo ello impide que el Estado Libre Asociado pueda reclamar buena fe en cuanto a las construcciones o mejoras que efectuare en los terrenos pertenecientes a H.P.Y. y a la Sucn. Mercado. El E.L.A. y cualesquiera otros edificantes individuales en los terrenos pertenecientes a H.P. Y. y a la Sucn. Mercado, son constructores de mala fe. Como tales, no tienen derecho alguno respecto de lo que hayan edificado en terreno ajeno, ni respecto al costo o desembolso que hayan realizado. ”

Más adelante, el Tribunal también añadió:

*689
“Al adquirir la propiedad privada ocupada por la Comunidad Punta Diamante, el Estado Libre Asociado en el ejercicio de su función social, ha logrado evitar la ejecución de la sentencia mediante el lanzamiento de los residentes, el desalojo de la Comunidad Punta Diamante y la demolición de lo allí construido ilegalmente. Los dueños de los terrenos han optado por aceptar la adquisición gubernamental de sus terrenos. Ello implica, por un lado, que los propietarios han consolidado la adquisición de las edificaciones en sus terrenos, haciéndolas suyas en virtud del derecho de accesión. Por el otro lado, el Estado ha adquirido esos terrenos con todos sus usos, mejoras, edificaciones y pertenencias inherentes a los mismos y ha asumido la obligación de pagar justa compensación por todo ello. ”

El Tribunal denegó las objeciones del Estado a compensar a la parte recurrida por las casas, mejoras, estructuras, edificaciones y construcciones en los terrenos adquiridos.
El Tribunal denegó, sin embargo, la solicitud de los recurridos de que se impusieran al Estado todos los gastos y honorarios incurridos por H.P.Y. y la Sucesión Mercado Riera durante el procedimiento. El Tribunal expresó que entendía que “el E.L.A. ha incurrido durante algunas etapas de estos procedimientos en una conducta que puede catalogarse de temeraria, obtusa e intransigente”. No obstante, concluyó que el reclamo de los recurridos resultaba improcedente y que sólo procedía imponer al Estado el pago de los gastos esenciales incurridos por H.P.Y. y la Sucesión Mercado Riera en el peritaje de valoración y agrimensura durante los procedimientos post-sentencia, así como la proporción correspondiente de los honorarios del Comisionado Especial.
Oportunamente, el E.L.A. solicitó reconsideración de las resoluciones emitidas por el Tribunal el 5 y el 14 de agosto de 1998. No surge que estas mociones hubieran sido acogidas por el Tribunal.
Insatisfecho, el E.L.A. acudió entonces ante este foro.
III
En su recurso, el E.L.A. plantea que erró el Tribunal al determinar que procedía compensar a los dueños de los terrenos por las estructuras construidas por los invasores de terrenos y por las obras de infraestructura realizadas por las agencias del E.L.A. y al aprobar el informe de valor preparado por el Comisionado Especial relacionado a la propiedad de H.P.Y.
1. El Pago de las Construcciones y Mejoras.
La Sección 9 del Art. II de la Constitución del Estado Libre Asociado de Puerto Rico establece, en su parte pertinente, que “[n]o se tomará o perjudicará la propiedad privada para uso público a no ser mediante el pago de una justa compensación y de acuerdo con la forma provista por ley. ” Véase, además 31 L.P.R.A. sec. 1113.
El Tribunal Supremo de Puerto Rico ha expresado que el derecho 1 gobierno a expropiar propiedad privada para uso público es un atributo inherente y necesario de la soberar, i y es superior a todos los derechos de propiedad. El título así adquirido no deriva su validez del título del du. ño anterior, sino que es un título nuevo, independiente y absoluto. Administración de Terrenos de Puerto Rico v. Nerashford Development Corp. _ D.P.R. _ (1994), 94 J.T.S. 113, a la pág. 82.
Según la doctrina desarrollada por dicho Tribunal, la justa compensación a la que tiene derecho el dueño de un predio expropiado es aquella cantidad que representa el valor de la propiedad al tiempo de la incautación. En ausencia de una definición estatutaria sobre este concepto de valor, el Tribunal ha favorecido la norma de fijarlo mediante la determinación del valor en el mercado del bien expropiado —el precio que un comprador estaría *690 dispuesto a pagar en una venta voluntaria y que un vendedor estaría dispuesto a aceptar, considerando para ello las condiciones en que se halle el bien a la fecha de la expropiación y el uso más productivo y beneficioso a que podría dedicarse dentro de un futuro razonablemente cercano, sin considerar las cargas o gravámenes que pesen sobre la propiedad. Administración de Terrenos de Puerto Rico v. Nerashford Development Corp., 94 J.T.S. 113, a la pág. 82; E.L.A. v. Fonalledas Córdova, 84 D.P.R. 573, 579 (1962); Pueblo.v. Colón, 73 D.P.R. 579, 584 (1952); Pueblo v. Huyke, 70 D.P.R. 754, 756 (1950).
La compensación, de ordinario, incluye, no sólo el valor del terreno, sino también el de cualquier estructura existente en la misma. Conforme al art. 287 del Código Civil, 31 L.P.R.A. sec. 1131, la propiedad de los bienes muebles o inmuebles conlleva el derecho de accesión a todo lo que se les une o incorpora, ya sea de forma natural o de forma artificial; véase, además, 31 L.P.R.A. 1161; véase, e.g., R. Elfren Bemier, El Derecho de Accesión en Puerto Rico, Barcelona, 1970.
Han de excluirse, sin embargo, factores subjetivos y/o especulativos. Hampton Development Corp. v. Estado Libre Asociado, 96 J.T.S. 4, a la pág. 565; Administración de Terrenos de P.R. v. Nerashford Development, _ D.P.R. _ (1994), 94 J.T.S. 113, a la pág. 82; Olivero v. Autoridad de Carreteras, 107 D.P.R. 301, 306-307 (1978); Pueblo v. McCormick, Alcaide & Co., 78 D.P.R. 939, 958 (1956); véase, además, 32 L.P.R.A. sec. 2915.
Ahora bien, el Estado no sólo se incauta de propiedades mediante el ejercicio directo de su poder de dominio eminente. Ello también ocurre cuando el dueño es privado de todo uso de sus bienes, mediante reglamentación, o cuando el Estado invade o permite que un tercero invada físicamente la propiedad. Culebra Enterprises Corp. v. Estado Libre Asociado de Puerto Rico, _ D.P.R. _ (1997), 97 J.T.S. 128, a las págs. 105-106; Hampton Development Corp. v. Estado Libre Asociado de Puerto Rico, _ D.P.R. _ (1996), 96 J.T.S. 4, a las págs. 559-561.
Cuando ha ocurrido una incautación sin que el Estado hubiera presentado una acción de expropiación, el dueño de la propiedad cuenta con una acción de expropiación a la inversa para obtener la compensación correspondiente. A ésta le son aplicables los mismos principios que rigen la acción de expropiación iniciada por el Estado. Culebra Enterprises Corp. v. Estado Libre Asociado de Puerto Rico, 91 J.T.S. 128, a la pág. 111; Hampton Development Corp. v. Estado Libre Asociado de Puerto Rico, 96 J.T.S. 4, a la pág. 559; Sucn. García v. Aut. Carreteras, 114 D.P.R. 676, 678 (1983); Flamboyán Gardens v. Junta de Planificación, 103 D.P.R. 884 (1975); Heftler International, Inc. v. J. de P., 99 D.P.R. 467, 474 (1970).
La obligación del Estado de compensar surge desde que ocurre la incautación. Culebra Enterprises Corp. v. Estado Libre Asociado de Puerto Rico, 91 J.T.S. 123, a la pág. 111; Pamel Corp. v. E.L.A., 124 D.P.R. 853, 856 (1989); E.L.A. v. Northwestern Const., Inc., 103 D.P.R. 377, 382 (1975); Planta de Cal Hicaco v. Tribunal Superior, 103 D.P.R. 385, 387 (1975).
La dilación en el pago por la incautación de la propiedad por el Estado se compensa mediante la imposición de intereses. Estado Libre Asociado v. Rexco Industries, _ D.P.R. _ (1994), 94 J.T.S. 151, a la pág. 514; cf. 32 L.P.R.A. sec. 2907.
En la situación de autos, según surge del expediente, H.P.Y. y la Sucesión Mercado Riera se han visto privados de la posesión de sus tierras desde que los predios fueron ilegalmente ocupados en 1985. Desde el punto de vista de dichas partes, su propiedad ha permanecido “incautada” desde entonces.
Aunque el E.L.A. inicialmente efectuó actos dirigidos a llevar a cabo el lanzamiento de los invasores, esta política cambió, y cuando menos desde 1988, se ha determinado la permanencia de la Comunidad Punta *691 Diamante y la compensación a los dueños de las propiedades afectadas.
La Sucesión Mercado recibió compensación por las 199 cuerdas objeto del caso KEF-88-0418, pero no por 17 cuerdas adicionales que también habían sido ocupadas ilegalmente. H.P.Y. no recibió compensación alguna por sus 90.003 cuerdas.
En su resolución, la distinguida Sala de Instancia concluyó que no fue hasta el 14 de mayo de 1996 que el Estado decidió incautarse de todas las propiedades. En ese momento, ya hacía muchos años que las estructuras y mejoras se habían construido sobre las propiedades, pero pesaba contra los invasores la sentencia emitida por el Tribunal de Primera Instancia el 4 de septiembre de 1991 en la que se había concluido que los invasores eran constructores de mala fe. El Tribunal concluyó que, en estas circunstancias, los dueños de las propiedades tenían derecho a hacer suyas las construcciones y que el Estado venía obligado a pagar por las mismas.
Estimamos que este resultado es irrazonable. Se trata de imponer al Estado el costo, no de unas cuantas estructuras temporeras, sino de una urbanización en la que habitan más de mil familias, construida hace más de diez años por las personas a cuyo favor el Estado está ejercitando su poder de dominio eminente, incluyendo el pago por calles, alcantarillado y otra infraestructura construida por las propias agencias gubernamentales. Según surge del expediente, H.P.Y. ha reclamado que el valor de dichas mejoras es de diez millones de dólares ($10,000,000.00), lo que excede por mucho el costo de la tierra ocupada.
Distinto al Tribunal de Primera Instancia, opinamos que, como cuestión de derecho, la incautación de las propiedades no ocurrió el 14 de mayo de 1996, sino mucho antes. La ocupación de los terrenos de H.P.Y. y de la Sucesión Mercado gozó de sanción gubernamental desde, cuando menos, el 3 de noviembre de 1988, cuando la Sala de Expropiaciones confirió título al Estado sobre una porción de los terrenos ocupados. Según indicado, a partir de ese momento, las agencias de gobierno se dedicaron al desarrollo de distintas facilidades de infraestructura para viabilizar la comunidad que se había organizado en el área como resultado de la invasión. Estas gestiones, que revistieron la ocupación con el carácter de acción del Estado, incluyeron todos los terrenos ocupados, aun aquellos que supuestamente no estaban envueltos en el procedimiento de expropiación.
En efecto, la construcción de facilidades de infraestructura por parte del Estado en las tierras de los recurridos, constituyó, en las circunstancias de este caso, un acto inequívoco de dominio, que significaba el desplazamiento de los derechos dominicales de H.P.Y. y la Sucesión Mercado Riera sobre los terrenos. A partir de este momento, los recurridos tenían derecho a ser compensados por la incautación de su propiedad bajo la Sección 9 del Art. II de la Constitución. Culebra Enterprises Corp. v. Estado Libre Asociado de Puerto Rico, 97 J.T.S. 128, a la pág. 111; Hampton Development Corp. v. Estado Libre Asociado de Puerto Rico, 96 J.T.S. 4, a la pág. 559.
El Tribunal de Primera Instancia concluyó que la incautación de los terrenos no se había realizado por el Estado en vista de las alegaciones reiteradas de los abogados del E.L.A. en el caso KEF-89-0418 de que no se deseaba expropiar los terrenos de H.P.Y.
Pero una cosa es lo que el Estado hace y otra lo que sus abogados puedan decir ante un Tribunal. El hecho de que el Gobierno pueda alegar, en una situación dada, en que no ha violado los derechos de un ciudadano, no es dispositivo ni releva a un Tribunal de determinar si, en efecto, tal violación se ha llevado a cabo y, de ser así, proceder a reparar la misma.
En la situación de autos, el anuncio por parte del Estado, producido el 14 de mayo de 1996, de que habría de pagar a los dueños por todas las tierras ocupadas por los invasores no es el origen del problema, sino más bien su *692 consecuencia. Habiendo sancionado la ocupación de los terrenos de los recurridos, el Estado se había hecho partícipe de su incautación y, por lo tanto, venía obligado a devolver las tierras o a compensar a sus dueños por las mismas.
Desde el punto de vista de H.P.Y. y la Sucesión Mercado Riera, no existió diferencia entre la suerte que corrieron las propiedades que fueron invadidas y compensadas en el caso KEF-88-0418 y los predios que no fueron compensados en dicho procedimiento. La realidad es que todos estos predios escaparon a la posesión de sus dueños en 1985 y fueron posteriormente desarrollados, con el auspicio del Estado, como parte de la Comunidad Punta Diamante.
La distinción entre ambos grupos de propiedades, de este modo, no se origina en los hechos ni en la suerte que han corrido los predios en cuestión, sino que descansa tínicamente en una distinción procesal, introducida en el caso KEF-88-0418, entre los predios que formaron parte de dicho caso y los que supuestamente fueron excluidos.
Pero el hecho de que el Estado no hubiera admitido antes su obligación de compensar a los dueños de las propiedades por la totalidad de los predios ocupados no significa que dicha obligación no hubiese existido. Aun si las propiedades hubieran sido devueltas a sus dueños, el Estado posiblemente hubiera venido obligado a compensar a los recurridos por la incautación. Culebra Enterprises Corp. v. Estado Libre Asociado de Puerto Rico, 97 J.T.S. 128, a la pág. 111; Hampton Development Corp. v. Estado Libre Asociado de Puerto Rico, 96 J.T.S. 141, a la pág. 559.
Es un dato importante, que al expropiar la finca de 199 cuerdas envuelta en el caso KEF-88-0418, el Estado no pagó por las edificaciones construidas por los invasores ni por las obras de infraestructura introducidas por las agencias. El hecho de que dicho procedimiento no hubiera incluido la totalidad de las tierras incautadas no debe llevar a la utilización de criterios distintos para la compensación de los terrenos que ahora nos ocupan y que están en la misma situación que los anteriores. Según indicado, la tardanza del Estado de compensar a un dueño por tierras incautadas se compensa mediante la imposición de intereses, Estado Libre Asociado v. Rexco Industries, 94 J.T.S. 151, a la pág. 514; 32 L.P.R.A. sec. 2907, no ampliando los parámetros de valoración del inmueble.
Cabe señalar que la Ley que gobierna las expropiaciones forzosas por parte del Estado específicamente dispone que la indemnización a concederse “tampoco incluirá aumento alguno por razón de mejoras públicas o inversiones que haya llevado a cabo en la localidad el Estado Libre Asociado de Puerto Rico a través de cualquiera de sus departamentos, ejecutivos, agencias o instrumentalidades. ” 32 L.P.R.A. sec. 2915.
El Tribunal de Primera Instancia se rehusó a aplicar dicho precepto en la situación de autos. Concluyó que el E.L.A. había actuado de mala fe, ya que conocía que los predios de H.P.Y. habían sido invadidos, á pesar de lo cual dicha parte insistió que los mismos no eran parte de la expropiación, para luego intervenir en el procedimiento de ejecución de la sentencia de desahucio alegando lo contrario.
Respetamos la determinación del Tribunal de Primera Instancia de que la conducta procesal desplegada por el E.L.A. en este caso fue temeraria y contradictoria. Nuestro ordenamiento, sin embargo, generalmente ampara al Estado de las consecuencias adversas que una conducta de este tipo acarrearía para una parte privada. Catalytic Ind. Maint. Co. v. F.S.E., 121 D.P.R. 98, 114 (1988); De León v. Sria de Instrucción, 116 D.P.R. 687, 688-689 (1985); Colondres Vélez v. Bayrón Vélez, 114 D.P.R. 833, 841-843 (1983).
El hecho de que el Estado hubiera actuado temerariamente al insistir que no venía obligado a compensar a H. *693 P.Y. por el terreno de dicha parte que había sido invadido, sin embargo, no altera nuestra conclusión de que, desde el punto de vista constitucional, dicha incautación sí se había llevado a cabo y que el Estado venía obligado a compensar a H.P.Y por la misma.
Es interesante señalar que, a pesar de las reiteradas representaciones del E.L.A. en el caso KEF-88-0418 de que no deseaba la expropiación de los terrenos de H.P.Y., el récord contiene numerosos indicios que reflejan el entendimiento de las partes que intervinieron en la controversia de que la política pública del Gobierno era la de preservar la Comunidad.
Así fue entendido por las agencias que participaron en el desarrollo de la infraestructura, quienes establecieron mejoras en los terrenos, incluyendo los predios de H.P.Y. que supuestamente no estaban incluidos en la expropiación.
El plano de expropiación, según hemos indicado, sí incluía los terrenos de H.P.Y. Al Tribunal de Expropiaciones se le dijo que ello había respondido a un error del agrimensor. No obstante, este “error” nunca fue corregido, a pesar de que el Tribunal lo ordenó.
La sentencia parcial emitida por el Tribunal el 7 de mayo de 1990 en el caso CS-85-1459, desestimando la reclamación por daños presentada por la Sucesión Mercado Riera contra el E.L.A., también hace referencia, como uno de los fundamentos para la desestimación, a la creencia de “todos, incluso la... Sucesión”, de que el terreno en controversia se encontraba “dentro de lo que ya ha sido expropiado. ”
Otro dato elocuente es la resistencia evidenciada por el Tribunal de Primera Instancia a poner en vigor la sentencia de desahucio emitida por dicho foro el 4 de junio de 1991. El Tribunal de Primera Instancia declinó poner en vigor este dictamen por más de siete años, no obstante las constantes súplicas de los recurridos de que así se hiciera. Ello posiblemente obedeció, no a dejadez alguna en el ejercicio de su autoridad, sino a la sabia intuición por parte del Tribunal de Instancia de que dicho resultado era contrario a la política pública adoptada y la trayectoria gubernamental seguida con respecto a la comunidad de invasores.
La peroración inicial del Tribunal en la resolución recurrida del 14 de agosto de 1998 transluce que su propósito era asegurar la permanencia de la comunidad. 
La actitud favorable del foro de Primera Instancia hacia los invasores de la propiedad, quienes, después de todo, son los causantes directos del problema, contrasta marcadamente con el tono crítico asumido por la Sala recurrida contra el E.L.A., quien está incurriendo en una inversión sustancial de dinero para asegurar a los residentes de Punta Diamante la permanencia en sus hogares.
A nuestro juicio, se impone un balance de intereses. El interés de H.P.Y. y de los demás titulares, en este sentido, es el de recibir un valor adecuado por su derecho de propiedad. Dicho interés ha de sopesarse con la meta social de viabilizar la estadía de una comunidad de más de mil familias, propósito que, aunque no elimina los derechos de los recurridos, ha de recibir una consideración preponderante. Véase, The Richards Group v. Junta de Planificación, 108 D.P.R. 23, 34-35 (1978).
Aunque la actitud procesal asumida por el E.L.A. en este caso dista mucho de ser ejemplar, no estimamos que dicha parte debiera ser “penalizada” mediante la imposición del pago por mejoras y estructuras que los recurridos no construyeron. Coincidimos con la parte recurrente en que, en las circunstancias del caso de autos, la imposición al Estado del pago millonario por estos renglones constituiría un enriquecimiento injusto para los dueños de las propiedades. Hatton v. Municipio de Ponce, _ D.P.R. _ (1994), 94 J.T.S. 2, a la pág. 11,432; *694 Ortiz Andújarv. E.L.A., 122 D.P.R. 817, 823 (1988).
Cabe señalar, por otro lado, que gran parte de la confusión procesal ocurrida en el caso de autos se debió a la decisión tomada por la Sala recurrida y por la Sala de Expropiaciones de no consolidar el procedimiento de autos con el caso KEF-88-0418. Dicha determinación, que posiblemente respondió a consideraciones de economía procesal o a una visión especializada de los procedimientos de expropiación, permitió la exclusión de H.P.Y. del caso KEF-88-0418, a pesar de que dicha parte claramente era una parte afectada por la expropiación.
La adquisición por el E.L.A. de la mayor parte de los terrenos invadidos, por otro lado, no fue tomada en cuenta en el caso CS-85-1459, a pesar de que la misma significaba que los titulares de los predios ya no contaban con una causa de acción contra la mayoría de los ocupantes de los predios. Dicho caso continuó ventilándose como una acción de clase aunque, previsiblemente, la sentencia dictada por el Tribunal no pudo ser ejecutada, ante la incertidumbre de quiénes eran las partes afectadas por la misma.
La peculiar situación procesal del litigio implicó que el E.L.A. y H.P.Y. no llegaron a disputar sus diferencias ante un árbitro judicial, sino hasta después de consumada la expropiación del caso KEF-88-0418 y de emitida la sentencia de desahucio. No fue hasta este momento que se aclaró de manera final los lindes entre la finca expropiada por el E.L.A. y las tierras de H.P.Y., emergiendo que hay una porción sustancial de los terrenos ocupados cuya compensación no ha sido pagada por el E.L.A.
La ilustrada Sala de Instancia entendió que su análisis de la controversia entre H.P.Y. y el E.L.A. estaba gobernado por lo resuelto en la sentencia emitida el 4 de junio de 1991, pero es cuestionable que dicha sentencia pueda ser invocada contra el E.L.A., quien no parece haber participado en el juicio sobre el desahucio.
Según el Tribunal de Primera Instancia, en la mencionada sentencia se adjudicó que los invasores eran constructores de mala fe y que los dueños de las propiedades tenían derecho a hacer suyas las construcciones y mejoras por accesión. No obstante, lo cierto es que el E.L.A. no ha litigado estos puntos con los recurridos, existiendo la posibilidad de que, de así hacerlo, se llegara a una determinación distinta. Surge del récord, por ejemplo, que las mejoras introducidas por las agencias en las propiedades de los recurridos fueron construidas abiertamente, sin que los dueños protestaran, lo que, a la luz del art. 300 del Código Civil, 31 L.P.R.A. sec. 1167, podría implicar que éstos también incurrieron en mala fe.
Concluimos que, contrario a lo resuelto por el Tribunal de Primera Instancia, H.P.Y. y la Sucesión Mercado Riera no tienen derecho al pago de las construcciones y mejoras desarrolladas en sus propiedades. La compensación a dichas partes por la dilación del Estado de pagarles por la propiedad incautada para el desarrollo de la Comunidad Punta Diamante lo constituye el interés legal correspondiente sobre el valor de la propiedad, lo que debe ser fijado a partir del 3 de noviembre de 1988, cuando la Sala de Expropiaciones confirió título al Estado sobre los terrenos envueltos en el caso KEF-88-0418.
2. El Informe de Valor del Comisionado.
La recurrente también sostiene que erró el foro de instancia al aprobar el informe del Comisionado. En síntesis, el E.L.A. alega que el Comisionado Especial erró al considerar en su análisis de valoración las ventas de dos propiedades que alegadamente no comparan con la parcela de terreno perteneciente a la recurrida H.P.Y.
Según indicado, el Tribunal Supremo de Puerto Rico ha establecido que la fijación de la justa compensación de una propiedad es mediante la determinación del valor en el mercado del bien expropiado a través de ventas comparadas. Administración de Terrenos de Puerto Rico v. Nerashford Development Corp. 94 J.T.S. 113, a la *695 pág. 82; E.L.A. v. Fonalledas Cordova, 84 D.P.R. a la pág. 579.
Se trata de una determinación confiada en primera instancia, a la discreción del Tribunal. E.L.A. v. Soc. Civil Agrícola e Industrial, 104 D.P.R. 392, 398 (1975). Los tribunales apelativos sólo intervienen con esta determinación cuando la suma concedida es exageradamente alta o ridiculamente baja, Culebra Enterprises Corp. v. Estado Libre Asociado de Puerto Rico, 97 J.T.S. 128, a la pág. 108, o cuando no halla suficiente apoyo en la prueba admitida. Pueblo v. Amadeo, 82 D.P.R. 102, 122 (1961); Estado v. Bravo, 79 D.P.R. 779, 787 (1956).
La determinación de la justa compensación que debe pagar el Estado por expropiación forzosa es esencialmente un ejercicio judicial, más que legislativo. Estado Libre Asociado v. Rexco Industries, 94 J.T.S. 151, a la pág. 514. La fijación de dicho valor requiere una hábil sincronización de varios factores, y en último análisis, un sano equilibrio entre el derecho de los propietarios y las exigencias de la comunidad. E.L.A. v. Fonalledas Córdova, 84 D.P.R. a la pág. 579.
En la situación de autos, las partes acordaron que el valor en cuestión fuera determinado, en primera instancia, por un comisionado seleccionado por acuerdo entre las partes. Tratándose de una materia eminentemente pericial, este curso estaba permitido por la Regla 41 de las de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 41; Vélez Ruiz v. E.L.A., 111 D.P.R. 752, 757 (1981).
El Comisionado rindió un informe, concluyendo que el valor en el mercado de la propiedad de H.P.Y. ascendía a $3,418,508.80, equivalente a un valor de $9.50 por metro unitario.
El E.L.A. cuestiona esta determinación, alegando que el Comisionado consideró la venta de otras propiedades, que por su topografía y circunstancias, no eran comparables a la propiedad en controversia. En particular, alega que se consideraron propiedades que tenían aprobados desarrollos residenciales, lo que aumentaba considerablemente su valor.
El Tribunal Supremo de Puerto Rico ha aclarado que las ventas de parcelas que se pretenden similares a la expropiada sólo resultan inadmisibles cuando, tanto por su cabida como por su topografía y localización no sean realmente similares a la expropiada. E.L.A. v. 317.813 Cuerdas de Terreno, 84 D.P.R. 1, 10 (1961); Pueblo v. Colón, 13 D.P.R. 579, 583 (1952).
En el presente caso, al igual que el Tribunal de Primera Instancia, hemos examinado el informe de dicho perito y no hallamos nada que nos mueva a sustituir su criterio.
Debe recordarse que no estamos ante la determinación directa del Tribunal de Primera Instancia, sino ante la de un Comisionado, cuya pericia ha sido reconocida, por ambas partes. El ámbito de nuestra revisión, por lo tanto, ha de ser necesariamente más limitado.
La Regla 41.5 (b) de las de Procedimiento Civil establece, en este sentido, que “[ejn todos los casos, el tribunal aceptará las determinaciones de hechos del Comisionado, a menos que sean claramente erróneas. ” 32 L.P.R.A. Ap. III, R. 45.1 (b); Vélez Ruiz v. E.L.A., 111 D.P.R. a las págs. 757-758; Lebrón v. P.R. Lt. & P. Co., 78 D.P.R. 683, 687-689 (1955). No entendemos que el error imputado se hubiera cometido.
Ahora bien, hemos concluido que la incautación de las propiedades en cuestión ocurrió el 3 de noviembre de 1988 y no el 14 de mayo de 1996, según determinara el Tribunal de Primera Instancia. Dicha conclusión podría requerir un ajuste en el informe del comisionado, para tomar en consideración el valor de la propiedad a esta *696 fecha.
Se devolverá, pues, el informe al Tribunal de Primera Instancia para que proceda de conformidad.
Por los fundamentos expresados, se expide el auto y se dejan sin efecto las resoluciones recurridas. En su lugar, se declara que el E.L.A. no viene obligado a pagar a los recurridos por. las construcciones y mejoras en las propiedades, sino intereses, al tipo legal, a partir del 3 de noviembre de 1988. Se devuelve el informe del Comisionado ante la consideración del Tribunal de Primera Instancia para cualquier revisión que dicho foro pueda tener a bien ordenar.
El expediente será devuelto ante el foro de Primera Instancia para la continuación de los procedimientos consistentes con esta sentencia.
Lo pronunció y manda el Tribunal y lo certifica la señora Secretaria General.
Aida Ileana Oquendo Graulau
Secretaria General
ESCOLIOS 2000 DTA 18
1. Dicha Sucesión, según se desprende del expediente, estaba compuesta por Eufemia Eileen, conocida por Eileen, y Adriana Mercado Parra, Eileen María y David Mario Cofffey Mercado, y María Luisa, Margarita María, y Richard Wilson Mercado.
2. Hasta donde este Tribunal puede determinar, el Sr. Hernández Ortiz no fue incluido en la demanda del E.L.A.
3. En la actualidad, la Administración de Desarrollo y Mejoras de Vivienda.
4. La Sala de Expropiaciones había declinado asumir competencia sobre los casos pendientes ante la Sala de Ponce, mediante Resolución emitida el 20 de mayo de 1989, entendiendo que las controversias eran separables.
5. Ese día, el Sr. Hernández Ortiz acordó una estipulación con los invasores que aparentemente dispuso de la controversia en el caso CS-86-2817. A partir de ese momento, los casos fueron desconsolidados.
6. Según se desprende del récord, entre abril 17 de 1996 y el 21 de febrero de 1997, el Tribunal celebró veintiuna (21) vistas para la discusión del problema, esfuerzo extraordinario y encomiable que indudablemente contribuyó a la resolución de la situación.
7. El anuncio en corte abierta hecho el 14 de mayo de 1996 por la Administración de Desarrollo y Mejoras de Vivienda Urbana, de que el Estado habría de compensar a los dueños por la totalidad de los terrenos ocupados, en este sentido, respondió a las numerosas y activas gestiones desplegadas por el Tribunal para persuadir a las agencias de cumplir con su responsabilidad hacia estos últimos. Opinamos que aun si la ilustrada Sala no hubiera sido exitosa en esta gestión, el Tribunal hubiera gozado de facultad para imponer al Estado la compensación que requiere la Sección 9 del Art. II de la Constitución.
8. Hemos examinado dicho dictamen, y esta última determinación no es clara.